**Application of Richard H. HUGHES et al.**

**Patent Appeal No. 76–656.**

United States Court of Customs and Patent Appeals.

March 10, 1977.

Richard L. Kelly, Houston, Tex., attorney of record, for appellant; George R. Jones, Arlington, Va., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and SHIRO KASHIWA, Associate Judge, United States Court of Claims.

RICH, Judge.

This appeal is from the February 23, 1976, decision of the Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejection of claims 6 and 7 in application serial No. 350,557, filed April 12, 1973, for "Ethylene Polymer Acidification Process," as obvious under 35 USC 103 in view of Clampitt et al.[1]  We reverse.

The application on appeal is a continuation of serial No. 48,436, filed June 22, 1970. In the parent application, a similar rejection of broader claims was affirmed by the board November 30, 1972.  Reconsideration was denied March 21, 1973.

*The Invention*

The invention is a method of forming films of ethylene copolymers with pendant acid groups, the films having moisture-resistant properties desired in packaging applications.

In discussing the prior art, appellants note in their specification that ethylene polymers with pendant carboxylic acid groups [2] have been found difficult to prepare directly.  They have normally been made by (1) forming an ethylene polymer with pendant ester groups,[3] (2) hydrolyzing the ester groups by heating the polymer in the presence of aqueous metallic base to form pendant metallic carboxylate salt groups,[4] and (3) converting the salt groups

1.  U.S. Patent No. 3,553,178, issued Jan. 5, 1971, on application serial No. 665,962, filed Sept. 7, 1967, hereinafter "Clampitt."

2.  E.g., ethylene-acrylic acid copolymer;
$$[-C-C-C-C-]_X .$$
$$O=C-OH$$

3.  E.g., ethylene-methyl acrylate copolymer;
$$[-C-C-C-C-]_X .$$
$$O=C-OCH_3$$

4.  E.g., the hydrolysis of ethylene-methyl acrylate copolymer in aqueous sodium hydroxide would yield a polymer with pendant sodium carboxylate groups;  $[-C-C-C-C-]_X .$
$$O=C-ONa$$

to pendant carboxylic acid groups by adding an acid. The hydrolysis step is said to result in a basic, polymer-in-water emulsion, the polymer having become self-emulsifiable due to the presence of the carboxylate salt groups. When an acid is added, the emulsion is neutralized, and the carboxylate salt groups are converted to carboxylic acid groups. The polymer with pendant acid groups, no longer being self-emulsifiable, coagulates and is recovered in solid form. Anspon et al., U.S. Patent No. 3,485,785,[5] is referred to in the instant specification as exemplary of such hydrolysis techniques.

Appellants say they have discovered a much simpler process for effecting similar conversions of carboxylate salt groups to carboxylic acid groups without the change in polymer form attendant upon the acidification of prior-art emulsions. In the claimed process, a *preformed film* of an ethylene polymer with pendant carboxylate salt groups [6] is contacted with aqueous ammonia solution at ambient temperature for a relatively short time and then dried. The dried film is found to contain a substantial number of carboxylic acid groups, although the mechanism by which they are formed is unclear.

Claim 6, the only independent claim, reads:

6. A method for chemically modifying at least the surface of a film of an ethylene copolymer containing pendant metallic carboxylate salt groups without changing the physical form of said film which consists essentially of, in combination,

1. immersing a film of an ethylene copolymer containing pendant metallic carboxylate salt groups into an aqueous ammonium hydroxide solution containing 0.5 to 28 weight % ammonia,

2. maintaining said film in said aqueous ammonium hydroxide solution at ambient temperature for a period of one to 30 minutes,

3. removing said film from said aqueous ammonium hydroxide solution,

4. drying the film from (3), and

5. recovering a film in which a substantial proportion of the pendant metallic carboxylate salt groups of the ethylene copolymer has been converted to the corresponding carboxylic acid groups;

said ethylene copolymer consisting of at least 67 mol % of polymerized ethylene and containing from 0.01 to 0.5 mol of pendant metallic carboxylate salt groups, per mol of ethylene, the metallic cation of the carboxylate salt groups being selected from the group consisting of metallic cations which are soluble in water or which form a water-soluble complex with ammonia.

### The Reference

Clampitt describes a process for coagulating aqueous emulsions similar to those resulting from the prior-art hydrolysis step acknowledged by appellants. In the reference process, carbon dioxide gas is bubbled through the emulsion to convert part or all of the carboxylate salt groups to the acid form, thereby effecting coagulation of the polymer. More important here than the *claimed* invention of Clampitt is the patent's disclosure of methods of *preparing* the emulsified raw material on which the claimed process acts. A one-step hydrolysis of an ethylene-alkyl acrylate copolymer in the presence of alkali metal hydroxide (alkali) and, optionally, ammonia is suggested wherein the product is said to "optionally" contain "acid and/or amide" groups. The significant descriptions of this process in Clampitt read as follows (emphasis ours):

Copending application *Ser. No. 131,108,* filed Aug. 14, 1961 by Jack Hurst and

---

5. Issued Dec. 23, 1969, on application serial No. 716,982, filed March 28, 1968, and purporting to be a "continuation" of application serial No. 131,108, filed August 14, 1961.

6. A solid polymer containing pendant carboxylate salt groups may be precipitated from basic emulsions by the addition of an electrolyte such as sodium chloride.

Harry D. Anspon describes the preparation of aqueous dispersions of water-insoluble, self-emulsifiable ethylene polymers containing pendent carboxylate salt groups which can be suitably employed in the process of this invention. As described therein, water-insoluble, but self-emulsifiable ethylene polymers containing pendent carboxylate salt groups are prepared by the hydrolysis in an aqueous medium of the acrylate groups of a thermoplastic ethylene-alkyl acrylate interpolymer employing *elevated* temperatures, a metallic base, and, optionally, a nitrogenous base to produce a stable aqueous dispersion of the ethylene polymer. *Reference is made to application Ser. No. 131,108 for complete descriptions of methods of preparing aqueous polymeric dispersions* applicable in the hereinafter described invention.

\* \* \* \* \* \*

*As heretofore noted* aqueous dispersions of such ethylene polymers can be prepared by the hydrolysis of a thermoplastic ethylene-alkyl acrylate polymer in an aqueous medium utilizing an alkali metal Hydroxide *and, optionally, a nitrogenous base such as ammonia* to hydrolyze a portion of all of the acrylate groups to the carboxylate salt *and, optionally, acid and/or amide form.*

## The Rejection

The examiner asserted that appellants' claimed process would have been obvious, within the meaning of 35 USC 103, from the description of the one-step hydrolysis in Clampitt. The examiner reasoned that (1) the claimed process is merely a two-step version of the reference process, (2) it is well known that the alkali reacts first to form the carboxylate salt group, and (3) after completion of the alkali reaction, the reference system is identical to that claimed, that is, a polymer with pendent carboxylate salt groups dispersed in aqueous ammonia. This analysis led the examiner to conclude that the fundamental chemical reaction involved in the claimed process was disclosed by Clampitt.

The board viewed the appeal below as, essentially, a request for reconsideration of its holding in the appeal taken in the parent application. Referring to both its original opinion and its opinion on reconsideration, the board stated that it was not persuaded of error in its earlier holding. In the opinion of the board, it was reasonable to assume that the "optional" use of ammonia was responsible for the "optional" formation of acid groups described by Clampitt. The board did not regard the recitation of a particular polymer form (film) in the claim as a patentable distinction because the form of the polymer did not appear, in its view, to influence the reaction.

## The Arguments

Appellants contend that the examiner and the board have misconstrued the reference in that the reaction there described introduces amide groups ($O=C-NH_2$) into the polymer, not acid groups as claimed. Although it is not entirely clear, appellants appear to rely on the more detailed description of the hydrolysis process in application serial No. 131,108[7] in support of their analysis. It is urged that the products of the claimed process and the reference process differ not only in chemical composition, but also in physical form. The claimed process is said to employ a film which remains unchanged in form throughout the ammonia treatment, while Clampitt converts a polymer in particulate form into an inseparable, colloidal emulsion. Finally, appellants note that the claimed process is carried out at *ambient temperature* and includes a drying step, whereas the reference process proceeds at *elevated temperatures* and has no drying step. For these reasons, it is alleged that the claimed process would not have been obvious from Clampitt.

---

7. Twice referred to in the quoted portions of Clampitt, supra, and now U.S. Patent No. 3,970,626, issued July 20, 1976.

The solicitor responds by arguing, in essence, that the examiner's construction of the reference is reasonable and has been controverted, if at all, only by argument, not by evidence. It is asserted that the *reaction* of ammonia with pendant carboxylate salt groups to form acid groups is disclosed by Clampitt and that the adaptation of such a reaction to the claimed environment represents nothing more than the exercise of routine skill.

## OPINION

Admittedly, Clampitt's hydrolysis reaction superficially resembles the claimed process. However, appellants' point that there are significant dissimilarities between the processes is well taken. That the form and composition of the starting materials, the reagents, the reaction conditions, and the form of the products are all different is not surprising once it is realized that the claimed process and the reference process are seeking to obtain entirely different results in entirely different ways. The PTO position is seemingly based solely on the assumption that Clampitt discloses appellants' fundamental chemical reaction. Whether the reaction is, in fact, the same, we do not know. Suffice it to say that, in our opinion, one of ordinary skill in the art would not have recognized the Clampitt reaction, or any part thereof, as adaptable to the *in situ* conversion of carboxylate salt groups to carboxylic acid groups at ambient temperature in preformed films.

The record supports appellants' arguments and, likewise, our conclusion. Clampitt does not purport to provide a *complete* description of the hydrolysis reaction. Rather, Clampitt incorporates by reference "application Ser. No. 131,108 for *complete* descriptions of [these] methods * * *." (Emphasis ours.) As we said in *In re Lund*,

376 F.2d 982, 989, 54 CCPA 1361, 1370, 153 USPQ 625, 631 (1967):

> * * * the purpose of "incorporation by reference" is to make one document become a part of another document by referring to the former in the latter in *such a manner that it is apparent that the cited document is part of the referencing document as if it were fully set out therein.* [Emphasis added.]

Thus, the 131,108 disclosure of these methods is part of the Clampitt disclosure and must be considered in determining what the reference as a whole would have fairly suggested to one of ordinary skill in the art. *In re Langer*, 465 F.2d 896, 59 CCPA 1256, 175 USPQ 169 (1972); *In re Boe*, 355 F.2d 961, 53 CCPA 1079, 148 USPQ 507 (1966). The reason for requiring consideration of the whole reference, as stated in *Langer*, is that

> * * * when "all of the disclosures in a reference" are considered, the overall suggestion to emerge from the prior art reference may be contrary to that which might appear from an isolated portion of the reference. [465 F.2d at 899, 59 CCPA at 1260, 175 USPQ at 171.]

This is particularly true when the "isolated portion" first considered is, by its own terms, merely an abstract of an incorporated document.[8]

Viewing the descriptions of the hydrolysis reactions in the 131,108 disclosure, the references in Clampitt to "elevated" temperatures and the formation of "amide" groups become significant. The incorporated material teaches that these reactions are conducted at temperatures of from 180°C to 300°C and are continued for many hours. The substantial conversion of ester groups to the *amide* form and the carboxylate salt form is emphasized. The only implication of acid group formation we find in the

---

8. Patent 3,970,626, which issued on application serial No. 131,108, is not in the certified record. Appellants' motion to add it to the certified record was opposed by the PTO, and we denied it without opinion October 19, 1976. However, U.S. Patent No. 3,485,785 is of record and purports (note 5, supra) to have issued on a "continuation" of serial No. 131,108. Appellants' counsel assured us at oral argument that the disclosures of these two patents are identical. We shall so assume. Were it otherwise, the PTO could not properly have permitted use of the term "continuation." The disclosure incorporated by reference in Clampitt is, therefore, available to us.

incorporated material appears in the description of the manner in which the resultant emulsions may be coagulated by the addition of an *acid*, presumably by conversion of salt groups to the acid form. Although we have no doubt that acid groups may be introduced into the *product* of the hydrolysis reaction,[9] it is not at all clear from the detailed descriptions of these processes that the acid groups are introduced *during the hydrolysis proper*, or that their presence can be *independently* attributed to the presence of aqueous ammonia solution.

We note that Example 16 of the 131,108 disclosure actually describes the independent reaction of aqueous ammonia solution with a *solid* polymer containing pendant carboxylate salt groups. The reaction is carried out at "elevated" temperatures for a relatively long time as would have been suggested by Clampitt. This appears to be exactly the "second step" of the bifurcated process which the examiner contended those of ordinary skill in the art would have expected to yield a polymer with pendant acid groups. The product of this reaction, however, is stated to be an *emulsion* wherein "a portion of the carboxylate groups are converted to *amide* groups" (emphasis ours), and is described as "typical" of the products resulting from the one-step hydrolysis. The formation of *acid* groups is nowhere suggested.

At best, the teachings of Clampitt, viewed as a whole, would have suggested the formation of acid groups along with amide and carboxylate salt groups by some unspecified mechanism in a high temperature reaction involving the *combination* of sodium hydroxide and ammonia to produce a polymer in emulsion form. Such a process would have in no way suggested that the reaction could be effected in a film, at ambient temperature, in the presence of ammonia alone, without changing the physical form of the polymer film, all as required by the appealed claims.

9.  Appellants would appear to admit this much in view of their description of a hydrolyzed polymer containing a mixture of carboxylate

Alternatively, Clampitt might reasonably be deemed to have suggested to one skilled in the art the conversion of carboxylate salt groups to acid groups, with an attendant change in form, only by the addition of an *acid*. In our opinion, that a similar conversion would result from the addition of a *base* (aqueous ammonia) would have been the epitome of unobviousness.

The decision of the board is *reversed*.

*REVERSED.*

salt, amide, and acid groups as the starting material in Example I in the instant specification.